563 So.2d 350 (1990)
BLACKIE'S RENTAL TOOL & SUPPLY COMPANY, INC., Plaintiff-Appellee,
v.
J.P. VANWAY d/b/a J.P. Oil Company, Defendant-Appellant.
No. 89-22.
Court of Appeal of Louisiana, Third Circuit.
May 23, 1990.
*351 Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Paul D. Gibson, John W. Penny, Jr., Lafayette, for plaintiff-appellee.
J. Barry Mouton, Lafayette, for defendant-appellant.
Before GUIDRY, DOUCET and YELVERTON, JJ.
YELVERTON, Judge.
This appeal arises out of a claim brought by Blackie's Tool & Supply Company, Inc. (Blackie's) against J.P. Vanway d/b/a J.P. Oil Company (J.P. Oil) for a sum allegedly due on an open account. Judgment was rendered against J.P. Oil for $6,902.39 plus attorney fees of 15% of the principal and interest. We affirm the money judgment, but we reverse the judgment awarding attorney fees, as well as the award of prejudgment interest.
Our function as an appellate court in reviewing findings of facts by a trial court is limited by the manifest error rule. Arceneaux *352 v. Domingue, 365 So.2d 1330 (La. 1978). After examining the entire record carefully, we find no manifest error. Our opinion begins with the trial judge's summarization of the facts, as follows:
This claim came about as the result of a long-standing personal and business relationship between two individuals, Walter Jenkins and J.P. Vanway.
Taken as a whole, the evidence at trial revealed the following facts. Walter Jenkins was employed for 17 years by a company known as Petco Services as manager of its tool stores in this state. J.P. Vanway owns J.P. Oil Company, a customer of Petco, and the two men became acquainted on a business level. Over the years they became personal friends as well.
Jenkins became a casualty of the economic decline in oilfield services when he was laid off by Petco Services in 1985. During his years with Petco Services, Jenkins had gained considerable knowledge and experience in the specialized use of "fishing tools" to clear obstructions in oil well drilling or work-over operations.
The plaintiff, Blackie's Rental Tool & Supply Company, and Jenkins, after his lay-off, decided to enter into a joint venture to provide fishing tools and services to oil well producers, a new aspect of the business for Blackie's Rental Tool & Supply Company.
At about this same time, J.P. Oil Company was engaged in workover operations on a well it owned in Vermilion Parish known as the Broussard # 1. There were problems with the well which required the use of "fishing tools" to attempt removal of obstructions downhole.
At this point the testimony becomes conflicting. Walter Jenkins stated that, after his layoff, he told J.P. Vanway of his plans to join up with Blackie's Rental Tool to perform "fishing" jobs. Jenkins claims that Vanway "had to be aware" of his plans to perform the "fishing" job on the Broussard # 1 well for him as the first job of the new partnership between Jenkins and Blackie's Rental Tool. He contends further that he never intended to do the job for free, and that Vanway, who was present at the well location on a regular basis, could easily see that rental tools were delivered to the site, and that Jenkins was proceeding with the "fishing" job. His position is that he was hired by Vanway to perform these services with fishing tools acquired through Blackie's Rental Tool by the process of "subrental", since Blackie's did not own any fishing tools itself.
Jenkins admits that he and Vanway never discussed fees for his services or prices for rental of tools. Upon completion of the job, Jenkins transferred the "field copies" indicating services and tools used on the job onto a Blackie's Rental Tool invoice which was then presented to Vanway for payment.
J.P. Vanway has not paid this invoice in full because his version of the circumstances is very different. Vanway denies any knowledge of Jenkin's partnership with Blackie's Rental Tool until receipt of the invoice for the Broussard # 1 job. He denies that he and Jenkins ever discussed the Broussard # 1 well job, other than that Jenkins "offered to help out." There was no mention of an operator's fee or of rental tools to be "sub-rented" for the job.
Vanway had no objection to Jenkins' presence at the well-site since he was out of work and offered his help. Vanway assumed that Jenkins was repaying J.P. Oil for materials and machine shop services provided to him without charge on previous occasions. Jenkins had then told him, "I'll repay the favor one of these days." Vanway contends that he doesn't know, "what Jenkins did out there," but, at any rate, the fishing job was unsuccessful.
Finally, Vanway claims that J.P. Oil Company had no need for Jenkins' services since the company always uses its own employees to perform fishing operations. Neither did J.P. Oil have need to rent fishing tools since it owned its own fishing tool company, which had nearly all of the tools needed for the operation. He assumed that Jenkins was obtaining the tools from Blue Marlin, the J.P. Oil owned company.
Jenkins and Vanway disagree on J.P. Oil's need for services and tools. Jenkins *353 contends that the operation in question was a "tough job" requiring the expertise and the services of a "fishing tool man" for 12 working days. Vanway calculated the duration of the fishing operation at 9 days, and maintains that he had employees capable of performing the work. The operator's fee charged by Jenkins was at the rate of $200 per day.
Jenkins testified that J.P. Oil had no tools other than the washer tubing needed for the fishing operation. Vanway's testimony was that his company owned all the tools needed except for oil jars, for which the rental rate was $780.00. It is further contended by Vanway that rental tool companies normally sub-rented to the industry at a discount of 10-25% on the normal rate. Jenkins set the discount at 10%, but agreed that J.P. Oil could have rented the tools directly and enjoyed the benefit of the discount. In this case the discount was given to Blackie's Rental Tool.
The bookkeeper for Blackie's Rental Tool & Supply Company testified that the invoice presented to J.P. Oil for the fishing operation amounted to $10,754.15. Other invoices, not related to that job, bring the total to $11,001.11. Blackie's Rental Tool received a check in the amount of $2,688.54 marked as "partial payment" of the fishing operation invoice. Since that payment, Annette Guilbeau, the bookkeeper, spoke with J.P. Vanway regarding the remainder of the invoice. On April 6, 1986 he told her he would soon send an additional $2,500.00, but never did. J.P. Vanway testified that his payment of $2,688.54 represented what he calculated to be the actual value of the services rendered.
The plaintiff has proved by a preponderance of the evidence that tools and services were provided to the defendant for which only partial payment has been made. The defendant has failed to prove that Walter Jenkins was providing these services free of charge or in repayment for materials and services previously given to him by J.P. Vanway.
The evidence remains inconclusive regarding the terms under which the tools and services were to be provided for the fishing operation. It is apparent that this controversy is the result of a misunderstanding or lack of communication between business associates and personal friends. No terms were negotiated; no agreement was reached regarding fees and prices; and, nothing was written down. Each of the parties involved made assumptions and drew conclusions from conversations between them, and each interpreted the circumstances surrounding this situation differently.
Though the necessity therefor, and the value thereof are in dispute, the fact remains that some services were performed and some tools supplied by the plaintiff to the defendant for which invoices were prepared, presented and partially paid.
The trial judge found that J.P. Oil's partial payment was an acknowledgment of the debt on open account, therefore the action was an enforceable action on open account.
Although we agree that Blackie's was owed a debt and is entitled to a judgment, we do not agree that the debt was an open account. A creditor suing on open account must prove that the debtor contracted for the sales on open account. Advertiser Div. of the Independent, Inc. v. Southwest Mortg. and Inv., Inc., 424 So.2d 1284 (La.App. 3d Cir.1982). Where there is no "meeting of the minds" between the parties, there is no consent, thus no enforceable contract. La.C.C. 1927; Howell v. Rhoades, 547 So.2d 1087 (La.App. 1st Cir.1989).
For there to be an action on an open account, there must necessarily be a contract which gave rise to the debt. The trial judge in his reasons for judgment stated:
Since the terms and conditions for the fishing operation services were never discussed, and since there was no clear understanding between the parties regarding the services to be performed, the tools to be supplied, or the fees and prices to be charged, an examination of these charges is in order.
We agree with the trial judge that there was no clear understanding between the *354 parties. To say it another way there was no "meeting of the minds" as to the price to be paid and services to be rendered. No written contract was ever executed, and it is clear from the record and the trial judge's reasons for judgment that J.P. Oil thought that Jenkins undertook the job solely to "help out" in return for the materials and services it had previously provided him. Furthermore, there was no understanding of Jenkins' and Blackie's joint venture/partnership arrangement with respect to this fishing job. J.P. Oil assumed that Jenkins would acquire the necessary fishing tool from and through Blue Marlin. Jenkins evidently thought that through his arrangement with Blackie's that he would charge J.P. Oil $200 a day and acquire the tools from and through Blackie's. J.P. Oil would then be billed accordingly for both Jenkins' services and tools rented and sub-rented from Blackie's.
Under these facts and circumstances we find there was no meeting of the minds between the parties, thus no contract. However, this determination will not leave the plaintiff without legal recourse. We may render any judgment which is just, legal, and proper upon the record on appeal. La.C.C.P. art. 2164.
A judgment based on the doctrine of quantum meruit is appropriate. As the court in Villars v. Edwards, 412 So.2d 122 (La.App. 1st Cir.1982), writ denied, 415 So.2d 945 (La.1982) explained:
The civil law of Louisiana recognizes the equitable doctrine of quantum meruit, based on the concept that one who benefits by the labor and materials of another should not be unjustly enriched thereby. Under those circumstances, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefor. The equitable doctrine of quantum meruit is based on the theory of quasi-contract, La.C.C. Arts. 2292-2294, and on the Christian principle of fairness proclaimed in La.C.C. Art. 1965.1
* * * * * *
1. Articles 2292-2294 reads:
"Art. 2292. Certain obligations are contracted without any agreement, either on the part of the person bound, or of him in whose favor the obligation takes place.
* * * * * *
"The obligations, which arise from a fact, personal to him who is bound, or relative to him, result either from quasi contracts, or from offenses and quasi-offenses.
"Art. 2293. Quasi contracts are the lawful and purely voluntary act of a man, from which there results any obligation whatever to a third person, and sometimes a reciprocal obligation between the parties.
"Art. 2294. All acts, from which there results an obligation without any agreement, in the manner expressed in the preceding article, form quasi contracts."
Under quantum meruit a party is entitled to recover the amount of materials and labor expended plus a fair profit. Villars v. Edwards, supra.
The trial judge awarded Blackie's $6,902.39 after deducting $300 from the $2,400 invoiced as Jenkins' services and after reducing the balance by 17.5% to reflect a fair discount for rented tools between tool companies. La.C.C. art. 2324.1. We find no abuse of discretion in the trial judge's assessment.
The trial judge further awarded an attorney's fee of 15% based on the adjusted principal and interest, believing this to be an open account case. A party may not recover attorney fees except where authorized by statute or provided for by contract. Hernandez v. Harson, 237 La. 389, 111 So.2d 320 (La.1958); Evans v. Century Ready Mix Corp., 446 So.2d 860 (La.App. 2d Cir.1984). Blackie's cannot recover attorney's fees since J.P. Oil's obligation arises out of a quasi-contractual relationship, and the open account statute, LSA-R.S. 9:2781, does not apply.
Furthermore, we find that a judgment based on quantum meruit bears interest only from date of judgment, not from date of judicial demand. Howell v. Rhoades, supra.
For the above and foregoing reasons the trial court's judgment is amended denying attorney's fees and prejudgment interest. In all other respects the judgment below is affirmed. Costs of this appeal are to be divided equally between the parties.
*355 AMENDED, AND AS AMENDED AFFIRMED.